# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **DIANE BLOW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-00293** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Diane Blow appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED,

and the case will be REMANDED for further proceedings in accordance with this Opinion and

Order.

## I. PROCEDURAL HISTORY

Blow applied for DIB on August 17, 2007, alleging disability as of January 1, 2005,

which she later amended to April 30, 2007. (Tr. 14, 130-32.) The Commissioner denied her

application initially and upon reconsideration, and Blow requested an administrative hearing.

(Tr. 72-75, 81-89.) On January 11, 2010, a hearing was conducted by Administrative Law Judge

("ALJ") John Pope, at which Blow (who was represented by counsel), her husband, and a

---

[1] All parties have consented to the Magistrate Judge. (Docket # 11); *see* 28 U.S.C. § 636(c).

vocational expert ("VE") testified. (Tr. 11-49.)  On March 11, 2010, the ALJ rendered an

unfavorable decision to Blow, concluding that she was not disabled because she could perform a

significant number of jobs in the economy. (Tr. 55-66.)  The Appeals Council denied her request

for review, at which point the ALJ's decision became the final decision of the Commissioner.

(Tr. 1-10, 249-51.)

Blow filed a complaint with this Court on August 25, 2011, seeking relief from the

Commissioner's final decision. (Docket # 1.)  In this appeal, Blow alleges that the ALJ

improperly discounted the credibility of her symptom testimony and the opinion of her treating

pain management specialist, Dr. Hedrick. (Opening Brief of Pl. in Social Security Appeal

Pursuant to L.R. 7.3 ("Opening Br.") 14-21.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Blow was forty-six years old and had worked for

twenty years as a cafeteria attendant. (Tr. 130, 187, 248.)  The record is unclear as to whether

she has a tenth grade education or graduated from high school. (Tr. 16-17, 65, 185, 473, 476.)

Blow alleges that she is disabled due to degenerative disk disease, obesity, knee problems, heart

disease, depression, and depression affecting medical conditions. (Opening Br. 2.)

At the hearing, Blow, who was approximately 5'7" tall and weighed 250 pounds, testified

that she lives in a tri-level home with her husband, who is retired. (Tr. 16, 27.)  She stated that

she has constant pain in her low back and down her legs to below her knees; the pain is the same

whether she sits, stands, or walks, but increases when she twists or bends. (Tr. 29-30, 33.)  She

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 813-page administrative record necessary to the decision.

takes various medications and has a surgically-inserted spinal stimulator and a surgically-inserted "pain pump" that administers medication, including morphine; she testified, however, that these medications are not particularly helpful in reducing her pain. (Tr. 19-23.) She did not complain of any current side effects from the medications. (Tr. 23.) She stated that she cannot afford to go to her physician as much as she should, but does get her prescriptions refilled. (Tr. 21.) She takes medication for depression, but does not go to counseling because she cannot afford it. (Tr. 27.)

As to her physical capacity, Blow stated that she does not bend, twist, or lift more than five pounds. (Tr. 19, 21, 33.) She walks with a cane in the house and uses a walker when outside; she has difficulty with stairs, and her husband helps her. (Tr. 31, 33.) She estimated that in an eight-hour workday, she could walk a total of thirty minutes and sit for a total of one hour. (Tr. 31-32.) She also reported that she has difficulty concentrating due to her pain. (Tr. 28, 34-35.)

In a typical day, Blow gets up around noon because she has difficulty sleeping, her husband helps her with her dressing and bathing, and then she lies back down, spending six to seven hours in bed each day. (Tr. 24-25.) She watches television, reads, and does crossword puzzles; her husband performs all of the household chores. (Tr. 24-26.) She can prepare simple meals using a scooter in her kitchen and sits in a shower chair for bathing; she also uses a scooter when she occasionally goes shopping with her husband. (Tr. 25-26.) Friends visit her once a week, and she has no difficulty getting along with people, but she rarely leaves home. (Tr. 27-28, 35.) Her husband usually drives her places, but she can drive herself if he is unavailable.[3] (Tr.

---

[3] Blow's husband also testified at the hearing and essentially corroborated her testimony. (Tr. 39-40.)

32.)

### B. Summary of the Relevant Medical Evidence

In July 2003, Blow consulted Dr. David Bojrab due to a two-year history of low back pain that radiated down both legs. (Tr. 309-10.)  She described the pain as an "eight" on a ten-point scale, and stated that physical therapy, medications, and a TENS unit had been unsuccessful. (Tr. 309.)  Dr. Bojrab administered three injections in August and September. (Tr. 303-08.)  In November 2003, Blow reported that she was unimproved after the injections, rating her pain as a "nine." (Tr. 302.)  Dr. Bojrab recommended a dorsal column stimulator, which was surgically implanted in early 2004. (Tr. 293-96, 302.)  After the implant, Blow's pain decreased to a "four." (Tr. 292.)

In April 2005, however, Blow's back pain complaints increased, and Dr. Bojrab ordered an EMG, the results of which were consistent with an S1 radiculopathy. (Tr. 289.)  He decided to resume injections. (Tr. 289.)  In September, Blow rated her pain as a "six," and Dr. Bojrab noted that she had a disk herniation at L5-S1, causing her left lower extremity pain. (Tr. 286.)  She also had a positive straight leg raising test and pain on palpitation of the lower lumbar spine. (Tr. 286.)  Dr. Bojrab performed five lumbar injections from October 2005 to March 2006. (Tr. 253-69.)  In April 2006, her relationship with Dr. Bojrab terminated due to a violation of her Medication Management Agreement. (Tr. 270.)

In June 2006, Blow consulted Dr. William Hedrick for her back pain. (Tr. 636-37.)  On a ten-point scale, she rated it as a "five" on her best day and a "ten" on her worst day, stating that it was aggravated by sitting or standing for prolonged periods. (Tr. 636.)  On exam, Dr. Hedrick noted diffuse sensitivity and regional tenderness over the low back, painful range of motion, and

an antalgic gait. (Tr. 637.)  His assessment was left sacroiliitis, chronic pain syndrome, low back pain, and status dorsal column placement; he prescribed various medications. (Tr. 637.)  Later that month, Blow rated her low back pain as an "eight" and her left leg pain as a "ten," reporting that she had difficulty sleeping. (Tr. 634.)  Dr. Hedrick concluded that the dorsal column stimulator was not working as it had in the past and that Blow was totally nonfunctional without it, to the point of being unable to walk; he increased her medications. (Tr. 634.)

In August, Blow told Dr. Hedrick that her pain was a "two" and that the medications had brought about noticeable improvement. (Tr. 629.)  Later that month, however, Blow's pain was back up to a "seven." (Tr. 627.)  In September, Blow reported that she had no further discomfort down her left leg and that her left side back pain was a "zero," but that her right side back pain was an "eight." (Tr. 434.)  She did not feel that her pain was well controlled; therefore, Dr. Hedrick adjusted her medications and prescribed steroid injections. (Tr. 431.)

In January 2007, Blow complained to Dr. Hedrick that her pain was poorly controlled, rating her back pain as a "nine" and her knee pain as a "ten." (Tr. 425.)  The next month, she rated her back pain as a "ten," stating that it radiated down her left knee and then through her toes, which were numb; she also complained of being unable to sleep. (Tr. 422.)  In March, Blow rated her pain as an "eight," and in April, a "ten"; she complained that the pain was interfering with her activities of daily living. (Tr. 406, 408, 414.)  Dr. Hedrick continued to adjust Blow's medications and prescribe steroid injections. (Tr. 418, 575.)  In June 2007, Blow received two injections and radio frequency ablation, which helped her for two weeks. (Tr. 389, 393-95.)  She complained her legs were "giving out" and that she had falls; she was prescribed a cane for ambulation. (Tr. 389.)  Blow continued her medications and received steroid injections two times

a month. (Tr. 382-83, 701-02.)

In September 2007, Blow saw Dr. William Nolan, Dr. Hedrick's partner, for her back and lower extremity pain. (Tr. 581-83.) She complained that her medications were not helping and that she wanted to come off of them because they were causing constipation. (Tr. 581.) She rated her pain as an "eight," had a positive straight leg raising test bilaterally, and ambulated with a walker. (Tr. 582.) Her motor exam was decreased throughout her lower extremities. (Tr. 582.) At her next several appointments, she reported that her pain was constant, but improving, and that she was experiencing a change in sensation in her lower extremities; the pain was alleviated by lying on her side. (Tr. 582, 568.) But in October, Blow again said that her pain was severe and uncontrolled, asserting that she needed more medication; she had recently visited the emergency room seeking pain relief. (Tr. 566.)

Also in September 2007, W. Shipley, Ph.D., a state agency psychologist, reviewed Blow's record and found that she did not have a severe psychological impairment. (Tr. 447-59.) Although she was diagnosed with depression, he concluded that it did not cause her limitations and that medication alleviated the problem. (Tr. 459.) He noted that her problems were related to her physical difficulties only, and that she could perform her activities of daily living without reminders, enjoyed reading and television, easily followed instructions, and could pay attention for one to two hours at a time. (Tr. 459.)

In October 2007, Blow was evaluated by Dr. H.M. Bacchus at the request of the state agency. (Tr. 461-62.) She told Dr. Bacchus that she used a cane for support, could sit indefinitely, stand twenty minutes, and walk two minutes, but carry no weight. (Tr. 461.) He observed that she had difficulty getting on and off the exam table and in and out of chair due to

her pain. (Tr. 462.)  There was pain with palpation and upon range of motion of the lumbar spine; her gait was slow and antalgic. (Tr. 462.)  She was unable to walk on heels or toes, tandem walk, hop, or squat; range of motion was deficient in the lower back, knees, and hips. (Tr. 462.)  She had a positive straight leg raising test; muscle strength and tone were normal in the upper extremities, but 4/5 in the lower extremities. (Tr. 462.)  Her grip strength was 4/5 bilaterally, and fine and gross dexterity were preserved. (Tr. 462.)  Dr. Bacchus diagnosed Blow with degenerative disk disease of the lumbosacral spine with mild disk bulge, chronic lower back and lower extremity pain, placement of spinal stimulator, history of hypertension, history of depression, and gait instability with the use of a cane for support. (Tr. 462.)  He opined that she could perform light duties, standing two hours in an eight-hour workday, noncontinuous, and that she could use her cane to travel short distances between work stations. (Tr. 462.)

Also in October 2007, Dr. F. Lavallo, a state agency physician, reviewed Blow's record and concluded that she could lift and carry ten pounds frequently; stand or walk at least two hours in an eight-hour workday with a hand-held assistive device; sit for about six hours in an eight-hour workday; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards. (Tr. 464-71.)  He further concluded that Blow could carry up to ten pounds in her free hand when ambulating with a cane. (Tr. 466.)  Dr. Lavallo's opinion was affirmed by a second state agency physician in April 2008. (Tr. 639.)

Later in October 2007, Blow underwent two psychological evaluations by Rodney Timberbrook, Ph.D., upon referral by Dr. Nolan, to determine whether her psychological condition might contraindicate the surgical implant of a pain pump. (Tr. 473-77.)  Blow reported

that she was tired of taking pain medications that did not work, had difficulty sleeping, and needed help from her husband to perform daily living activities. (Tr. 475.) An MMPI-2 showed that Blow was experiencing significant emotional discomfort and malaise; tended to develop physical symptoms in response to psychological stress; and may have difficulty making decisions. (Tr. 475.) Dr. Timberbrook opined that it was likely that her depression, tension, and anxiety symptoms exacerbated her pain. (Tr. 475.) He diagnosed her with depression NOS and depression affecting mental conditions and concluded that she was an appropriate candidate for the surgical implant procedure. (Tr. 483.)

In November 2007, Blow told Dr. Nolan that her pain continued to be uncontrolled and that she recently went to the emergency room for help. (Tr. 563-64.) The following month, Blow's pain was better controlled after receiving another injection, but she still could not stand up straight. (Tr. 563.) In late December, she underwent the permanent implant of an intrathecal catheter and infusion pump and was placed on intrathecal morphine. (Tr. 557.) Dr. Nolan indicated that her pain improved. (Tr. 557.)

However, in January 2008, Blow again told Dr. Nolan that her pain was worsening and that she felt the pain pump was not helping; she was taking medication as often as she could. (Tr. 553, 555.) The next month, Blow reported again that her pain was increasing, stating that it was so severe she could not sleep at night. (Tr. 551.) She stated in March that the pain was stable, but in May that it was again increasing; Dr. Nolan continued to adjust her intrathecal medication. (Tr. 676.) By August, Blow's pain had improved, but she continued to feel lumbar "pressure" that limited her activities. (Tr. 670.) But by October 2008, Blow articulated that her pain had increased in intensity. (Tr. 670.)

In early 2009, Dr. Nolan increased the pain medications in Blow's pain pump because her pain was worsening. (Tr. 659, 662.)  In February, April, June, and July, Dr. Hedrick again adjusted Blow's pain pump in response to her symptoms. (Tr. 651-58.)  In August, Blow told Dr. Hedrick that her pain was very severe, elaborating that it was throbbing, "pressured," and constant; she rated it as a "ten" on a ten-point scale. (Tr. 648.)  Blow received more steroid injections in August 2009 and January 2010. (Tr. 761-63.)

In September 2009, Dr. Hedrick completed a medical source statement for Blow. (Tr. 716-19.)  His diagnoses included chronic back pain secondary to failed back surgery, lumbar radiculopathy requiring spinal cord stimulator implant, intrathecal pain pump placement, knee arthralgias, and chronic pain syndrome. (Tr. 716-19.)  He listed the following clinical findings: degenerative disk disease at L5-S1, pain pump in dorsal column stimulator in place, severe pain in knees including synovial thickening, palpable tenderness in the back, and problems with the sacroiliac joints. (Tr. 716-19.)  He noted she was 5'7" tall and weighed 250 pounds; identified her symptoms as chronic back and knee pain; and listed objective signs of abnormal gait, tenderness crepitus, swelling, muscle spasm, and impaired sleep. (Tr. 717.)

Dr. Hedrick further opined that Blow's symptoms would interfere with the attention and concentration needed to perform even simple tasks on a frequent basis. (Tr. 717-18.)  He estimated that she could walk one block, sit for thirty minutes at a time, stand for ten minutes at a time; lift less than ten pounds occasionally and more then ten pounds rarely, and could work no more than four hours in an eight-hour workday. (Tr. 717-18.)  She needed to walk for five minutes every thirty minutes and would need to take a fifteen minute break every two hours. (Tr. 717-18.)  She would need to use a cane for occasional standing or walking. (Tr. 717-18.)  He

anticipated that she would miss about two days of work per month. (Tr. 719.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12

10

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On March 11 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 55-66.) He found at step one of the five-step analysis that Blow had not engaged in substantial gainful activity since her alleged onset date and at step two

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

that her degenerative disk disease and obesity were severe impairments. (Tr. 57.) At step three, the ALJ determined that Blow's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 60.)

Before proceeding to step four, the ALJ determined that Blow's symptom testimony was not reliable to the extent it was inconsistent with the following RFC (Tr. 62):

> [T]he claimant has the residual functional capacity to perform sedentary work . . ., with the following exceptions: the claimant may lift/carry 10 pounds occasionally and less than 10 pounds frequently; stand/walk at least two hours in an eight-hour workday with the use of an assistive device for ambulation; and sit about six hours in an eight-hour workday. The claimant must never climb ladders, ropes or scaffolds, and may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to wetness and wet or uneven surfaces.

(Tr. 60).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Blow was unable to perform her past relevant work as a cafeteria attendant. (Tr. 64.) At step five, however, the ALJ found that Blow, despite her impairments, could perform a significant number of other jobs in the economy despite her impairments, including food and beverage order clerk, cashier, and telephone quotation clerk. (Tr. 65-66.) Accordingly, Blow's claim for DIB was denied. (Tr. 66.)

### C. The ALJ's Credibility Determination Will Be Remanded

Blow contends, among other things, that the ALJ improperly discounted the credibility of her symptom testimony. Because his reasoning with respect to Blow's credibility determination is, in part, difficult to trace, the ALJ's credibility determination will be remanded.

Credibility determinations are the second step in a two-step process prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain or other

symptoms. *Williams v. Astrue*, No. 1:08-cv-1353, 2010 WL 2673867, at \*9-10 (S.D. Ind. June 29, 2010); *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); 20 C.F.R. § 404.1529; SSR 96-7p.  First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment—that is, an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms. *Krontz v. Astrue*, No. 1:07-cv-00303, 2008 WL 5062803, at \*5 (N.D. Ind. Nov. 24, 2008); *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); 20 C.F.R. § 404.1529; SSR 96-7p.  If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Bellmore v. Astrue*, No. 4:08-cv-94, 2010 WL 1266494, at \*10 (N.D. Ind. Mar. 25, 2010); *Walker v. Astrue*, No. 4:09-cv-44, 2010 WL 1257441, at \*5 (S.D. Ind. Mar. 25, 2010); 20 C.F.R. § 404.1529(c).  "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p.  In doing so, the ALJ must consider in addition to the objective medical evidence: the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes

to alleviate pain; treatment, aside from medication, the claimant has received and other measures the claimant uses to relieve pain. 20 C.F.R. § 404.1529(c); SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ found that Blow had an underlying medically determinable physical impairment that could reasonably be expected to produce her alleged symptoms. (Tr. 62.) Accordingly, the ALJ proceeded to step two to evaluate the functionally limiting effects of Blow's alleged symptoms to determine the extent to which they would affect her ability to do basic work activities. *See Herron*, 19 F.3d at 334; 20 C.F.R. § 404.1529; SSR 96-7p. There, after reviewing the medical evidence, Blow's daily activities, and use of medication, the ALJ concluded that Blow's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC he had assigned for sedentary work. (Tr. 62.) In doing so, the ALJ articulated:

> Based on the overall medical record, including the objective imaging and pain management regimen, the undersigned has assessed a sedentary residual

14

functional capacity in this case.  Additionally, due to gait instability and a prescribed assistive device, the undersigned finds additional manipulative, postural, and environmental restrictions appropriate, such as the above-defined limitations in using stairs (like in her home) and other activities.  In terms of the claimant's alleged more severe physical limitations, the undersigned must find them only partially credible.  The ability to perform at the level in the residual functional capacity is supported by claimant's activities of daily living, the diagnostic testing in evidence, and two objective opinions of record.

(Tr. 63.)

Of course, "an ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *accord Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009).  Unfortunately, here, "we are left to ponder what exactly are these inconsistencies because the ALJ provided no further explanation." *Zurawski*, 245 F.3d at 887 (stating that the ALJ should have explained the inconsistencies between the claimant's activities of daily living (which were punctured with rest), his pain complaints, and the medical evidence). "Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*. (internal quotation marks omitted).

While the ALJ did describe Blow's daily activities, "those activities are fairly restricted . . . and not of a sort that necessarily undermines or contradicts a claim of disabling pain." *Id*. Blow represented that she requires help from her husband for dressing, bathing, and climbing stairs (Tr. 25, 37, 475, 480), performs all of her daily activities at a slower pace and with frequent breaks (Tr. 195), spends six to seven hours in bed during the day (Tr. 24), and that her

husband performs almost all of the household chores and shopping. (Tr. 26.)  On this record, the Court is "hard-pressed to understand how [Blow's minimal daily activities] support[] a conclusion that she was able to work a full-time job, week in and week out, given her limitations." *Jelinek*, 662 F.3d at 812.  "[M]inimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." *Clifford*, 227 F.3d at 872; *see also Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (unpublished) (opining that the claimant's minimal daily activities, which included two hours of house chores punctuated with rest, cooking simple meals, and grocery shopping three times per month, were not inconsistent with her claims of disabling pain); *Zurawksi*, 245 F.3d at 887 (same).

Similarly, the ALJ cited Blow's "pain management regimen" when determining her RFC and discounting her credibility, but failed to explain with any particularity how this regimen is inconsistent with her complaints of disabling pain. *See, e.g.*, *Carradine*, 360 F.3d at 755 ("What is significant is the improbability that Carradine would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs . . . , but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints . . . ."); *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998) ("Another objective medical fact supporting Cox's subjective complaints of pain is the consistent diagnosis of chronic lower back pain, coupled with a long history of pain management and drug therapy, including the implantation of the intrathecal morphine pump.  It is obvious that physicians have determined Cox was experiencing great pain.").

Furthermore, the ALJ "does not explain why the objective medical evidence does not support [Blow's] complaints of disabling pain." *Clifford*, 227 F.3d at 872.  In any event,

16

"[c]laims of severe pain can be credible even if they are unsupported by significant physical and diagnostic examination results." *Ramey*, 319 F. App'x at 429 (citing *Carradine*, 360 F.3d at 755). "The ALJ must therefore examine the record for other corroborating evidence." *Id.* (citing 20 C.F.R. § 404.1529(c)(3); SSR 96-7p).

Specifically, "claims of disabling pain can be corroborated by repeated diagnoses of severe pain, alternative explanations for the intensity of the pain, and the claimant's willingness to undergo (and physicians' willingness to order) invasive and burdensome treatment . . . ." *Id.* (considering in its remand of the ALJ's credibility determination that the claimant had a spinal stimulator inserted in her back and that her physicians were considering implanting a morphine drip to help her manage her pain); *accord Carradine*, 360 F.3d at 755; *see Daniel v. Barnhart*, No. 1:04-cv-2089, 2006 WL 3207983, at *10 (S.D. Ind. Mar. 30, 2006) (finding that the ALJ failed to recognize in his credibility finding that claimant's long history of treatment supported her allegations of disabling pain). Here, Blow, who was diagnosed with chronic pain syndrome, was willing to undergo the permanent implantation of both a spinal stimulator and a pain pump in her spine, and her treating physicians were willing to surgically implant these devices, lending credence to her complaints of disabling pain.

Admittedly, as the ALJ noted, his discounting of the credibility of Blow's symptom testimony to the extent it describes limitations in excess of an RFC for sedentary work is supported by the opinions of Dr. Bacchus and the state agency physicians, who limited her to light and sedentary work, respectively. (Tr. 83.) Yet, his credibility determination is inconsistent with the opinion of Dr. Hedrick, Blow's treating pain management specialist, who penned a more restricted view of her functional ability. Thus, the medical source opinions of record do

not particularly assuage the Court's concern about the ALJ's significant, but unexplained, reliance on Blow's activities of daily living and pain medication regimen in discounting her credibility. *See Zurawski*, 245 F.3d at 888 (remanding credibility determination to investigate "all avenues" that relate to claimant's pain complaints even though several physicians had opined that claimant could return to work).

In sum, "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," 20 C.F.R. § 1529(c)(3), requiring the ALJ to also rely upon the claimant's daily activities, use of medication and treatment measures, and other factors identified in 20 C.F.R. 404.1529(c) and SSR 96-7p. Here, the ALJ fails to explain with sufficient particularity how Blow's activities of daily living and pain management regimen undercut the credibility of her complaints of disabling pain and, consequently, fails to build an accurate and logical bridge from the evidence to his credibility determination. *See Ramey*, 319 F. App'x at 430; *Carradine*, 360 F.3d at 755; *see generally Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Accordingly, the case will be remanded so that the ALJ may reassess the credibility of Blow's complaints of debilitating pain in accordance with Social Security Ruling 96-7p and build an accurate and logical bridge between the evidence of record and his conclusion.

### D. The ALJ's Discounting of Dr. Hedrick's Opinion Should Be Re-Examined Upon Remand

Blow also contends that the ALJ's decision to assign less weight to the opinion of Dr. Hedrick than the reviewing state agency physicians is not supported by substantial evidence. Blow's argument has some merit.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to

the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Here, Dr. Hedrick opined that Blow could walk one block, sit for thirty minutes at a time, stand for ten minutes at a time; lift less than ten pounds occasionally and more then ten pounds rarely; could work no more than four hours in an eight-hour workday; would need to walk for five minutes every thirty minutes and take a fifteen minute break every two hours; and anticipated that she would miss about two days of work per month. (Tr. 717-19.) Ultimately, the ALJ chose to assign less weight to Dr. Hedrick's opinion than the opinion of the state agency physicians, who reviewed Blow's record and opined that she could perform sedentary work. (Tr.

63-64.)  The ALJ, keeping "in mind the biases a treating physician may bring to the disability evaluation," discounted Dr. Hedrick's opinion because it was expressed in "a standard form 'fill-in-the-blank' medical questionnaire where the opinion is without explanation in the form of a narrative." (Tr. 64.)

But Dr. Hedrick *did* include some narrative in support of his opinion in the form of clinical findings and a description of Blow's pain. (Tr. 716.)  Specifically, he penned on the form that, among other things, Blow had chronic pain syndrome secondary to failed back surgery, degenerative disk disease at L5-S1, a pain pump and dorsal column stimulators in place, synovial thickening and effusion in her back, and severe palpable tenderness over the right SI joints and facet joints. (Tr. 716.)

Moreover, the Seventh Circuit has stated that "[a]lthough by itself a check-box form might be weak evidence, the form takes on greater significance when it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010).  Here, "there is a long record of treatment by Dr. [Hedrick] that supports his notations on the form." *Id*.  Dr. Hedrick saw Blow at least seventeen times between June 2006 and September 2009, in addition to the times when he performed procedures on her. (Tr. 389, 404, 406, 408, 414, 418, 422, 425, 430, 434, 636-37, 648-50.)  She received injections at least nine times. (Tr. 382-83, 393-95, 414, 425, 434, 575, 761-63.)  At those visits, Dr. Hedrick documented, among other things, that Blow had: significant right lumbosacral facet arthropathy, significant difficulty with extension of the back from a flexed position, tenderness over L4-L5 and L5-S1 facets, torque positive right great than left, Patrick's test positive on the right, positive cross on the left, midline tenderness, leg numbness to light touch, reflexes 2/4 throughout, and a positive straight leg raise. (Tr. 402, 406,

434-36, 442-44, 634, 637, 649.) Moreover, Dr. Hedrick's partner, Dr. Nolan, saw Blow for numerous visits as well concerning her pain pump. (Tr. 551, 555, 566, 568, 570, 581, 651-58, 662, 670, 672, 676.)

Indeed, the ALJ's "fill-in-the-blank" rational in this instance is difficult to trace, considering that he chose to assign "great" weight to the opinion of the state agency physicians who *also* completed a fill-in-the-blank form. (*Compare* Tr. 716-19, *with* Tr. 464-71.) Although the state agency physicians included a list of medical findings on their form, they were simply iterations of the findings of Dr. Hedrick and Dr. Bacchus and did not include a narrative explanation of how these findings actually supported their conclusions. (Tr. 465.) And significantly, the state agency physicians make *no* mention of Blow's pain levels or chronic pain syndrome.

Moreover, at the time the ALJ rendered his decision in March 2010, Dr. Hedrick's September 2009 opinion was "the most recent professional word" on Blow's impairments by a treating physician who had seen her repeatedly over a two-and-a-half year period. *Jelinek*, 662 F.3d at 812. In contrast, the state agency physicians who reviewed the record and rendered their opinion did so in October 2007 and April 2008. *See, e.g., id.* (finding in that instance that the ALJ would be "hard-pressed to justify casting aside" the treating physician's opinion in favor of state-agency opinions that were two years old). Thus, in this particular instance, it is difficult to follow the ALJ's rationale for discounting the opinion of Dr. Hedrick's opinion merely for the reason that it was rendered on a "fill-in-the-blank" form.

And, although "an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their

patients' disability claims," *Labonne v. Astrue*, 341 F. App'x 220, 225 (7th Cir. 2009)

(unpublished) (citing *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *Dixon*, 270 F.3d at

1177), "there is no presumption of bias against a treating physician's disability opinion," *Spain*

*v. Astrue*, No. 09-1088, 2010 WL 2774438, at *6 (C.D. Ill. July 13, 2010) (citing *Edwards v.*

*Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993)). That is, "[t]he ability to consider bias . . . is not

synonymous with the ability to blithely reject a treating physician's opinion or to discount that

physician's opportunity to have observed the claimant over a long period of time." *Micus v.*

*Bowen*, 979 F.2d 602, 609 (7th Cir. 1992). Here, the ALJ found no actual evidence of bias and

thus, in light of the Court's difficulty in tracing the ALJ's "fill-in-the-blank" logic, the ALJ's

reliance on the "possibility" of bias is dubious.

Of course, "in, the end, it is up to the ALJ to decide which doctor to believe . . . subject

only to the requirement that the ALJ's decision be supported by substantial evidence." *Books v.*

*Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (citation and internal quotation marks omitted); *accord*

*Micus*, 979 F.2d at 608. Yet the Court is not convinced that the reasons provided by the ALJ for

discounting of Dr. Hedrick's opinion in this instance constitutes substantial evidence, and thus,

upon remand, the opinion should be given further consideration. *See Clifford*, 227 F.3d at 869

(explaining that the court does "not reweigh the evidence, resolve conflicts, decide questions of

credibility, or substitute [its] own judgment for that of the Commissioner").[5]

---

[5] Blow contends that she is entitled to a remand for an award of benefits, rather than a remand for further proceedings. (Opening Br. 21.) But generally, a remand for further proceedings by the Commissioner is the appropriate remedy when an ALJ's decision is not supported by substantial evidence. *Rohan v. Barnhart*, 306 F. Supp. 2d 756, 770 (N.D. Ill. 2004). An award of benefits is "essentially a factual finding best left for the [Commissioner] to address in the first instance, *unless* the record can yield but one supportable conclusion." *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993) (emphasis added); *see also Briscoe v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) ("It remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability."); *Rohan*, 306 F. Supp. 2d at 770. Here, the record does not yield just one supportable conclusion in favor of Blow (*compare, e.g.*, Tr. 31-32, *with* Tr. 461), and thus the case

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and

the case is REMANDED to the Commissioner for further proceedings in accordance with this

Opinion and Order.  The  Clerk is directed to enter a judgment in favor of Blow and against the

Commissioner.

SO ORDERED.

Enter for this 6th day of August, 2012.

S/Roger B. Cosbey

Roger B. Cosbey,
United States Magistrate Judge

---

will be remanded for further examination of the credibility of Blow's pain complaints, together with the medical
source opinions of record.